IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2026

**TORAN HARPER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 15-04996      Lee V. Coffee, Judge

_____

**No. W2025-00700-CCA-R3-PC**

_____

The Petitioner, Toran Harper, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief, claiming that he received the ineffective assistance of trial counsel. Based upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Donald Hackett, III, Memphis, Tennessee, for the appellant, Toran Harper.

Jonathan Skrmetti, Attorney General and Reporter; Ryan W. Davis, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In 2017, a Shelby County Criminal Court Jury convicted the Petitioner of the first degree premeditated murder, the first degree felony murder, and the attempted especially aggravated robbery of Kendrick Marr (hereinafter "the victim"). The jury also convicted the Petitioner of the aggravated robbery of Frederick Marr (hereinafter "Mr. Marr"), who was the victim's cousin, and being a felon in possession of a weapon. The trial court merged the murder convictions, and the Petitioner received an effective sentence of life plus seventy-five years in confinement. On direct appeal of his convictions, the Petitioner claimed that the evidence was insufficient to support the convictions because the witnesses gave inconsistent testimony, no faces could be seen in the video evidence, and the

codefendants were not credible.[1] *State v. Harper*, No. W2017-00875-CCA-R3-CD, 2019 WL 480203, at \*7 (Tenn. Crim. App. Feb. 6, 2019), *perm. app. denied* (Tenn. June 24, 2019). This court affirmed the Petitioner's convictions. *Id*. at \*10.

According to this court's direct appeal opinion, Mr. Marr testified at trial that on the night of February 28, 2015, he and the victim went to a party. *Id*. While there, the victim received several telephone calls from someone. *Id*. After the party, Mr. Marr drove the victim to a gas station on Lamar Avenue so that the victim could meet the person with whom the victim had been speaking on the telephone. *Id*. Mr. Marr and the victim arrived at the gas station about midnight, and Mr. Marr parked the white Nissan Altima he was driving beside a gas pump. *Id*. About one minute later, two women arrived and got into the back seat of the Altima. *Id*. Mr. Marr saw the victim pass pills to the women, but Mr. Marr did not know if the victim was selling or giving the pills to them. *Id*. About one minute later, a man jumped into the back seat of the Altima. *Id*. The two women immediately got out of the Altima, but Mr. Marr thought the women and the man "'had to be together.'" *Id*. Mr. Marr later identified the man as the Petitioner. *Id*.

Mr. Marr testified that the Petitioner had a gun. *Id*. The Petitioner pointed the gun at Mr. Marr and the victim and told them, "'Drop it off. Give me everything you got in your pocket.'" *Id*. Mr. Marr and the victim told the Petitioner that they did not have anything, but the Petitioner hit the victim on the head with the butt of the gun and demanded money. *Id*. Mr. Marr gave the Petitioner ninety to ninety-five dollars from his pocket, but the Petitioner continued to hit the victim and demand money. *Id*. The victim turned around and started "'tussling'" with the Petitioner, and the Petitioner warned the victim that he was going to shoot the victim if the victim did not stop. *Id*. at \*1-2. The victim kept fighting the Petitioner, so the Petitioner shot the victim. *Id*. at \*2. All three men got out of the car. The Petitioner ran away, and Mr. Marr went to the store for help. *Id*. When Mr. Marr turned around, he saw that the victim was lying on the ground. *Id*.

Mr. Marr testified that he later went to the police department, gave a statement, and identified the Petitioner from a photograph array. *Id*. Mr. Marr said the lights at the gas station were bright, and he was "certain" the Petitioner was the shooter. *Id*. at \*1, 2. The State played security video from the gas station during Mr. Marr's testimony. *Id*. at \*2. On cross-examination, Mr. Marr testified that he saw the women for less than one minute. *Id*. He later identified them as Tonisha Thompson and Gabrielle McNeil. *Id*. at \*1.

Tonisha Thompson testified on the night of February 28, 2015, she and Ms. McNeil arranged to meet the victim at a gas station on Lamar Avenue to buy pills from him. *Id*. at

---

[1] This court may take judicial notice of the record presented on direct appeal of a petitioner's convictions, and we choose to do so in this case. *See State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009).

*2. The Petitioner, who was "'getting high'" with the women in a motel room, said he would go with them and "'just take the pills.'" *Id*. The Petitioner had a gun when the three of them left the motel room to meet the victim. *Id*. at *3.

Ms. Thompson testified that she drove the Petitioner's car to the gas station but let the Petitioner out of the car at a motel near the gas station. *Id*. When Ms. Thompson and Ms. McNeil arrived at the gas station to meet the victim, Ms. Thompson and Ms. McNeil got into the back seat of the white Altima. *Id*. Ms. Thompson was sitting behind Mr. Marr, and Ms. McNeil was sitting behind the victim. *Id*. Ms. Thompson told the victim that she wanted to buy Xanax. *Id*. As she began to pay him for the pills, the Petitioner got into the back seat beside Ms. McNeil, started waving the gun, and demanded that Mr. Marr and the victim give him "'everything they got.'" *Id*. Ms. Thompson said she was "'shocked'" because she did not know the Petitioner was going to demand money from the victim. *Id*. Ms. Thompson and Ms. McNeil ran from the Altima and later picked up the Petitioner near a butcher shop. *Id*. The Petitioner told them that the victim would not give him the pills but that he obtained seventy dollars. *Id*. Ms. Thompson did not know the victim was dead at that time but learned from her mother the next morning that the victim had been killed. *Id*. Ms. Thompson asked the Petitioner if he shot the victim, and the Petitioner said he did not remember. *Id*. The police arrested Ms. Thompson on March 3, 2015. *Id*. She said she initially lied to officers about the crimes but eventually told them the truth. *Id*.

Gabrielle McNeil also testified about the shooting, and her account was similar to that of Ms. Thompson. *See id*. at *4. She stated that the morning after the shooting, she and Ms. Thompson asked the Petitioner if he killed the victim. *Id*. She said the Petitioner responded, "'Man, I don't know. We was tussling in the back, and the gun shot off through the back seat. When I jumped out, he collapsed in the parking lot.'" *Id*. at *5. The police later arrested Ms. McNeil for her role in the crimes. *Id*. She said that she gave a truthful statement to the police and that she identified the Petitioner and Ms. Thompson from photograph arrays. *Id*. She denied knowing about a plan to rob the victim. *Id*.

Alexis Harris, who had stopped at the station to buy gasoline, testified that she "'heard something like a tire pop'" and then saw a man with a gun run across Lamar Avenue. *Id*. On March 30, 2015, Ms. Harris selected the Petitioner's photograph from an array and wrote on the array that "I'm not sure, but it look like the man" who had the gun. *Id*. Terrica Jackson, who was with Ms. Harris at the gas station, testified that she saw the victim fall to the ground and saw another man with a gun. *Id*. at *6. Ms. Jackson also identified the Petitioner from a photograph array but was "unsure" of her identification. *Id*.

Lieutenant Chester Striplin of the Memphis Police Department ("MPD") testified that he obtained the gas station's security video. He discerned from the video that one of

- 3 -

the perpetrators had walked to the gas station from a nearby motel. *Id*. On cross-examination, Lieutenant Striplin testified that the video did not show the face of anyone involved in the crimes. *Id*.

Officer Matthew Williams of the MPD testified that he was the first officer to arrive at the scene and that the victim was lying on the ground. *Id*. The victim had a small amount of blood on his shirt, was unresponsive, and was not breathing. *Id*. Paramedics arrived and pronounced the victim deceased. *Id*. Officer Marcus Mosby of the MPD's Crime Scene Investigation Unit testified that he collected a nine-millimeter shell casing and a crushed prescription pill bottle from the parking lot. *Id*. at *7.

Dr. Paul Benson, the medical examiner who performed the victim's autopsy, testified that a bullet entered the victim's left chest. *Id*. The bullet perforated the victim's lungs, heart, diaphragm, and liver, and he experienced a "'lethal amount'" of internal bleeding. *Id*. Toxicology testing showed the presence of a prescribed amount of alprazolam, also known as Xanax, and low amounts of marijuana and codeine in his system. *Id*.

The Petitioner did not testify or put on any proof, and the jury found him guilty of the offenses as charged in the indictment. *Id*. The trial court sentenced him to life for each murder conviction and merged the convictions. *Id*. The trial court sentenced him as a Range III, persistent offender to thirty years for the attempted especially aggravated robbery of the victim and to fifteen years for being a felon in possession of a firearm. *Id*. The Petitioner was a repeat offender, so the trial court sentenced him to thirty years to be served at one hundred percent for the aggravated robbery of Mr. Marr. *Id*. The trial court ordered that the sentences be served consecutively to each other and to the life sentences for a total effective sentence of life plus seventy-five years. *Id*.

The Petitioner filed a timely pro se petition for post-conviction relief, claiming, in pertinent part, that he received the ineffective assistance of trial counsel. The post-conviction court appointed counsel, and counsel filed an amended petition, contending that trial counsel was ineffective for failing to object to testimony by the victim's sister because the testimony was unfairly prejudicial and cumulative; for failing to object when it was discovered that one of the jurors knew one of the witnesses; for failing to object to Mr. Marr's repetitive testimony about the Petitioner's assaulting the victim; and by failing to object to the State's leading questions during Mr. Marr's direct testimony, which bolstered his credibility.

Trial counsel testified for the Petitioner that he was licensed to practice law in 1997. He began trying criminal cases "in earnest" in 2001 and averaged five cases per year, except during the Coronavirus pandemic. He estimated that he had tried one hundred ten

to one hundred thirty cases during his career with one-half of them being murder cases. He acknowledged that he was "capital certified" and said that he had tried five capital cases.

Trial counsel testified that the trial court appointed him to represent the Petitioner in 2015 and that he met with the Petitioner approximately ten times. About five of those meetings occurred in the jail. Trial counsel said that he liked the Petitioner and that the Petitioner was "a low-stress client." Although trial counsel did not specifically remember providing the Petitioner with a copy of discovery, it was trial counsel's standard practice to do so. The shooting was recorded on video, and the Petitioner's two codefendants were scheduled to testify against him; therefore, the State did not make a formal plea offer. Trial counsel talked with the Petitioner about offering to plead guilty in exchange for a forty-year sentence, but the Petitioner did not want to plead guilty.

Trial counsel testified that the trial court appointed an investigator to the defense. The investigator reviewed the discovery materials and recommended that the Petitioner "settle this case." Trial counsel said he did not think the investigator interviewed the Petitioner's codefendants because their lawyers would not allow them to speak with the investigator. At that point, the post-conviction court, which had presided over the Petitioner's trial, stated for the record that the trial court appointed an investigator to the defense on October 28, 2015, and that the Petitioner's two codefendants, Ms. Thompson and Ms. McNeil, were each charged with two counts of first degree murder, one count of attempted especially aggravated robbery, and one count of aggravated robbery.

Trial counsel testified that the defense's strategy was to discredit the codefendants and Mr. Marr. Trial counsel said that the strategy "was not a very sound strategy" but that the Petitioner did not have an alibi and claimed only that he did not participate in the crimes and was not the person in the security video. The Petitioner did not want to testify and did not have any witnesses to testify on his behalf. Trial counsel thought he and the Petitioner discussed that the defense was not going to call any witnesses. Trial counsel said the Petitioner "seemed to doze off" during the trial.

Trial counsel testified that he did not remember the victim's sister, Tina Marr, testifying at trial, so post-conviction counsel had trial counsel review an excerpt from Ms. Marr's trial testimony to refresh his recollection. [2] After reviewing the transcript, trial counsel said he thought Ms. Marr was the State's "corpus witness." Ms. Marr testified that she found out from a telephone call that the victim was deceased. Trial counsel said that he did not remember if Ms. Marr was upset during her testimony but that most corpus witnesses were "emotional." He acknowledged that he could have objected to her

---

[2] This court's direct appeal opinion did not mention Ms. Marr's testimony. *See Harper*, 2019 WL 480203.

testimony as hearsay but said that a hearsay objection would have been "silly" because the issue at trial was whether the Petitioner killed the victim, not whether the victim was deceased. Trial counsel said that objecting to Ms. Marr's testimony also would have made trial counsel "look hateful" in the eyes of the jury when the defense's strategy was "to be as likable and as believable as possible." Trial counsel acknowledged that he could have filed a pretrial motion to exclude Ms. Marr's testimony and that Mr. Marr could have served as the State's corpus witness. Trial counsel said that, in hindsight, filing a pretrial motion to exclude Ms. Marr's testimony would have been "a good idea."

Trial counsel acknowledged that according to the trial transcript, a female juror recognized Ms. Marr during Ms. Marr's testimony. Post-conviction counsel asked trial counsel about possible bias by the juror, and trial counsel stated, "Well, I suppose [bias] could have happened. I don't know which way the bias would cut. It could be a bias in favor of believing the witness or it might have been that the juror hated the witness. But you're correct that there might have been a bias."

Trial counsel acknowledged that Mr. Marr testified twice on direct examination about the Petitioner's assault of the victim and that trial counsel did not lodge an objection. Trial counsel said that he was not sure Mr. Marr's testifying twice about the assault was an issue or that the trial court would have sustained an objection. Trial counsel also did not object when the State asked Mr. Marr leading questions. Trial counsel explained, "I don't like to object to leading questions, because I think the jury sees that the witness cannot keep his story straight unless the prosecutor feeds it to him[.]" Trial counsel said that the State's use of leading questions probably meant Mr. Marr's memory of the shooting was not "strong." Trial counsel did not think his failure to object to affected the outcome of the trial.

On cross-examination, trial counsel acknowledged that the Petitioner did not have any defenses such as diminished capacity or self-defense and that the State could have impeached the Petitioner with his prior convictions if the Petitioner had testified. The Petitioner's codefendants were drug users, so trial counsel tried to attack their credibility. However, the security video corroborated their testimony. Moreover, the codefendants and Mr. Marr identified the Petitioner as the perpetrator. Trial counsel acknowledged that the State had a right to call Ms. Marr as a corpus witness to identify the victim. Trial counsel said the proof against the Petitioner was "overwhelming"; therefore, trial counsel's objecting to Ms. Marr's testimony would not have changed the outcome of the trial.

Trial counsel acknowledged that although a female juror recognized Ms. Marr during Ms. Marr's testimony, the juror did not indicate that she and Ms. Marr had a close relationship or were friends. Trial counsel said he would have objected to the juror's remaining on the jury if there had been a reason to do so. Only some of the State's

questions to Mr. Marr were leading, and trial counsel did not think the leading questions made any difference in the outcome of the trial. Trial counsel acknowledged that he could have asserted during his closing argument that the State's leading questions showed Mr. Marr was not believable and did not remember what occurred. On redirect-examination, trial counsel testified that he did not recall making those assertions during his closing argument.

The Petitioner testified that trial counsel met with him only one time, "[w]hen there was [an] offer on the table." The Petitioner said that he did not remember the terms of the offer but that he did not want to accept it. The Petitioner also met with trial counsel when the Petitioner appeared in court. Trial counsel gave discovery materials to the Petitioner but did not review the materials with him. The Petitioner did not talk with the defense investigator or obtain the investigator's notes, and trial counsel did not discuss the defense's strategy with the Petitioner.

The Petitioner testified that he sat behind trial counsel at trial and that they did not discuss what was happening during the trial. The Petitioner said trial counsel should have stressed to the jury that the video did not show any faces and that his codefendants lied during their testimony. Moreover, the medical examiner did not testify about any injuries to the victim's head, but trial counsel did not make that argument to the jury. The Petitioner said that he wanted trial counsel "to put some kind of effort in" but that trial counsel "was no help in trial." The Petitioner said that he provided trial counsel with "a few things" that would have been helpful at trial, but that trial counsel did not listen to him.

Upon being questioned by the post-conviction court, the Petitioner reiterated that he would not have pled guilty, regardless of the offer. The post-conviction court asked if the Petitioner wanted witnesses to testify on his behalf at trial, and the Petitioner said yes. The post-conviction court asked if the Petitioner gave the names of the witnesses to trial counsel, and the Petitioner answered, "Of course I did." The Petitioner said he did not remember telling the trial court that he did not have any complaints about trial counsel. The post-conviction court asked the Petitioner what trial counsel should have done differently, and the Petitioner stated, "He could have -- he could have worked harder with the witnesses and the evidence. As the evidence, as of the video."

At the conclusion of the hearing, the post-conviction court orally denied the petition for post-conviction relief. Regarding trial counsel's failure to object to Ms. Marr's testimony about the victim, the post-conviction court recalled that Ms. Marr testified as the State's corpus witness to prove the victim's identity, that her testimony was "[v]ery, very, very brief," and that she did not testify about any facts of the case. The post-conviction court found that an objection to Ms. Marr's testimony would not have affected the outcome of the trial. Regarding a juror's recognizing Ms. Marr, the post-conviction court recalled

from its trial notes that the juror "thought she might know Ms. Marr" but that Ms. Marr did not appear to recognize the juror and that neither party wanted to voir dire the juror. The post-conviction court noted that the juror may have been one of two alternates excused at the close of the proof and, therefore, that the juror may not have decided the case. As to trial counsel's failure to object to the State's leading questions on direct examination, the post-conviction court noted that Tennessee Rule of Evidence 611 allowed the use of leading questions on direct examination to develop a witness's testimony and found that the trial court would not have sustained an objection by trial counsel.[3] The post-conviction court also found that, in any event, trial counsel made a tactical decision not to object and that the State's leading questions did not affect the outcome of the trial. Finally, the post-conviction court found that the proof against the Petitioner was "overwhelming" and that the Petitioner failed to present any evidence at the evidentiary hearing that would have made a difference in the outcome. Accordingly, the post-conviction court concluded that the Petitioner failed to show he received the ineffective assistance of counsel. On April 14, 2025, the post-conviction court entered an order denying the petition. This appeal followed.

## ANALYSIS

The Petitioner contends that the post-conviction court erred in denying relief. The State argues that the post-conviction court properly denied the petition. We agree with the State.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citations omitted). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction

---

[3] Tennessee Rule of Evidence 611(c)(1) provides, "Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness's testimony."

court's findings of fact. *Phillips*, 647 S.W.3d at 400 (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The Petitioner contends that trial counsel was ineffective for failing to object to Mr. Marr's "repetitive" testimony about the victim's assault and for failing to object to the State's leading questions during Mr. Marr's testimony.[4] The trial transcript reflects that Mr. Marr said on direct examination that he and the victim told the Petitioner that they did not have anything and that the Petitioner hit the victim on the head with the gun. Mr. Marr then said that he gave what he had in his pocket to the Petitioner but that the Petitioner "kept hitting [the victim] in the head, demanding money from him." Several pages later in the transcript, the following colloquy occurred:

> Q. And you said that [the Petitioner] was pointing [the gun] at you and pointing it at [the victim]?
>
> A. Yes, ma'am.
>
> Q. How was [the Petitioner] hitting [the victim] on the head with it?
>
> A. With the butt of it, like this (demonstrating).
>
> Q. Okay. How many times did he hit [the victim]?
>
> A. Around three or four times.

Although the post-conviction court did not address this specific issue in its oral or written denial of the post-conviction petition, we conclude that Mr. Marr's testimony was not repetitive. Mr. Marr initially stated that the Petitioner struck the victim repeatedly with the gun. He later demonstrated how the Petitioner hit the victim with the gun and clarified that the Petitioner hit the victim three or four times. Therefore, trial counsel was not deficient for failing to object to Mr. Marr's testimony.

Regarding the State's leading questions to Mr. Marr, trial counsel acknowledged that the State asked leading questions but that he did not object because leading questions gave the jury the impression that the witness was not credible and that the witness's memory of the event was not strong. The post-conviction court accredited trial counsel's testimony that he made a strategic decision not to object, and we will not second-guess trial counsel's decision.

---

[4] We note that the Petitioner should have explained in his brief which parts of Mr. Marr's trial testimony were repetitive. *See* Tenn. R. App. P. 27(a)(7)(A). However, we are able to discern his argument from his citations to the trial transcript in his amended petition for post-conviction relief.

Next, the Petitioner contends that trial counsel was ineffective for failing to object to Ms. Marr's testimony about the victim's death because her testimony was "cumulative" to the medical examiner's testimony and was prejudicial. The trial transcript reflects that Ms. Marr was the State's first witness and that she identified a photograph of the victim taken while he was alive. She said she found out about the victim's death via a telephone call she received from her mother and that she went to the victim's funeral but "didn't walk in." The transcript confirms the post-conviction court's findings that Ms. Marr's testimony was the State's corpus witness, that her testimony was very brief, and that she did not testify about any facts of the case. *See State v. White*, No. W2003-02558-CCA-R3-CD, 2005 WL 729167, at *3 (Tenn. Crim. App. Mar. 30, 2005) (stating that a corpus witness is usually a friend or relative of the victim who had no knowledge of the facts of the case and whose testimony is limited to identifying the victim). Therefore, the record does not preponderate against the post-conviction court's finding that an objection to Ms. Marr's testimony would not have changed the outcome of the trial.

The Petitioner also contends that trial counsel was ineffective for failing to object to a juror's remaining on the jury when trial counsel learned the juror knew Ms. Marr. The trial transcript reflects that at the conclusion of Ms. Marr's testimony, the trial court asked her to look at the jury and asked if she recognized any of the jurors. Ms. Marr responded, "She look[s] familiar." The trial court told Ms. Marr that she could step down from the stand and asked the parties to approach the bench. Out of the jury's hearing, the trial court advised the parties that it had received a note from an unidentified juror, stating that the juror might know Ms. Marr. The trial court stated that Ms. Marr apparently did not recognize anyone on the jury, and neither party requested that the trial court voir dire the jurors. Although the post-conviction court speculated that the juror in question was one of two named jurors who ended up being dismissed from the jury at the close of the proof, the juror's identity was never revealed, so the juror's being dismissed as an alternate was not confirmed. In any event, the Petitioner failed to present any proof that a juror was biased against him. Therefore, the Petitioner is not entitled to relief on this issue.

Finally, the Petitioner contends that trial counsel's errors, taken together, had the cumulative effect of causing prejudice at trial. The cumulative error doctrine requires relief when "multiple errors [are] committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted). Moreover, in the context of an ineffective assistance of counsel claim, cumulative error "examines the prejudicial effect of multiple instances of deficient performance." *Adams v. State*, No. M2018-00470-CCA-R3-PC, 2019 WL 6999719, at *31 (Tenn. Crim. App. Dec. 20, 2019). The Petitioner has not shown that trial counsel rendered deficient performance.

- 11 -

Therefore, he is not entitled to post-conviction relief based on the doctrine of cumulative error.

## CONCLUSION

Upon our review, we affirm the judgment of the post-conviction court.

s/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE